1   Mark S. Horoupian (CA Bar No. 175373)
     *mark.horoupian@gmlaw.com*
2   Steven F. Werth (CA Bar No. 205434)
     *steven.werth@gmlaw.com*
3   **GREENSPOON MARDER LLP**
    333 South Grand Avenue, Suite 3400
4   Los Angeles, California 90071
    Telephone: 213.626.2311
5   Facsimile: 954.771.9264

6   Attorneys for Howard M. Ehrenberg,
    Chapter 7 Trustee
7

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **LOS ANGELES DIVISION**

| | |
|---|---|
| 11  In re: | Case No. 2:21-bk-16403-VZ |
| 12  SPECTRUM LINK, INC., | Chapter 7 |
| 13             Debtor. | Adversary No.: |
| 14 | **COMPLAINT TO AVOID AND RECOVER AVOIDABLE TRANSFERS** |
| 15  HOWARD M. EHRENBERG, Chapter 7 Trustee, | |
| 16             Plaintiff, | Place:    255 East Temple Street |
| 17      vs. |              Los Angeles, CA 90012 |
| 18  IDEAL LUXURY, LLC, | The Hon. Vincent P. Zurzolo |
| 19             Defendant. | |

20          Plaintiff Howard M. Ehrenberg, solely in his capacity as the chapter 7 trustee

21   ("Trustee") of Spectrum Link, Inc. ("Debtor") brings this adversary proceeding against

22   Ideal Luxury, LLC ("Defendant") and alleges as follows:

23

24                      **INTRODUCTION**

25      1.      This suit seeks the avoidance and recovery of transfers made by the Debtor

26   to the Defendant in the four-year period prior to August 11, 2021 (the "Petition Date"), the

27   date the Debtor commenced this bankruptcy case.  The transfers at issue total $52,839.00,

28   and are identified in paragraphs 41- 44 by date and amount.  These transfers are defined

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1  below as the "Four-Year Transfers".  The Debtor made the Four-Year Transfers as part of

2  a fraudulent scheme involving the sale and leaseback of radio antennas that caused the loss

3  of tens of millions of dollars to more than one hundred unsuspecting investors.

4      2.    The Debtor made the Four-Year Transfers with the actual intent to hinder,

5  delay, and defraud the Debtor's creditors.  The Debtor's creditors consisted primarily of

6  individuals who the Debtor convinced to purchase one or more antenna towers, at $25,000

7  per tower, that the Debtor would then lease back from the investor, as part of the Debtor's

8  business of providing Internet service in certain large U.S. cities.  A Youtube video posted

9  May 4, 2021, in which the Debtor's General Manager, Mr. William Wright ("Mr. Wright")

10  explains this investment opportunity, is at *www.youtube.com/watch?v=d7Cxbk05JxA*.

11      3.    The Debtor did not generate sufficient revenue to repay its investors, and

12  relied on new investment money to make interest payments to old investors, as well as to

13  pay its operating expenses.  The Debtor transferred a substantial amount of inventor money

14  to insiders, either directly or, as in the case with the Defendant, to third parties to pay debt

15  incurred by insiders for which the Debtor was not responsible.  The Debtor also transferred

16  investor money to third parties to maintain the illusion that it was a legitimate business.

17  This enabled the Debtor to lull additional investors into making new investments.  The

18  Debtor also made payments to certain investors to keep them from complaining, or

19  commencing legal action.

20      4.    The Trustee requests that this Court grant relief that will return the Four-

21  Year Transfers to the Debtor's estate ("Estate").  The Trustee seeks avoidance and recovery

22  of the Four-Year Transfers under 11 U.S.C. §§ 544, 548, and 550, and California Civil

23  Code § 3439.04.

24                              **JURISDICTION AND VENUE**

25      5.    This is an adversary proceeding, pursuant to Federal Rule of Bankruptcy

26  Procedure, which relates to the Chapter 7 proceeding captioned In re Spectrum Link, Inc.,

27  Case No. 2:21-bk-16403-VZ  (Bankr. C.D. Cal., Los Angeles Division).

28      6.    This Court has subject matter jurisdiction over this action pursuant to section

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a), in that this adversary proceeding arises in, arises under, and/or relates to Debtor's chapter 7 case.

7.    This adversary proceeding is a core proceeding under section 157(b)(2) of Title 28 of the United States Code, such that this Court has jurisdiction to hear and determine this proceeding and to enter an appropriate order and judgment. The Trustee consents to entry of a final order or judgment by this Court.

8.    This Court is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409(a) because the Debtor's chapter 7 case is pending in this judicial district.

## PARTIES

9.    The Trustee is the duly appointed, authorized, and acting Chapter 7 Trustee for the Estate. The Debtor commenced a voluntary bankruptcy case under Chapter 11 of the United States Code (the "Bankruptcy Code") on August 11, 2021. Howard M. Ehrenberg was initially appointed Chapter 11 Trustee of the Estate on November 20, 2021. Subsequently, the Court converted this case to one under Chapter 7 of the Bankruptcy Code. The Trustee was appointed as Chapter 7 Trustee of the Estate on December 23, 2021, and he has served in that capacity since.

10.    Defendant Ideal Luxury, LLC is a California limited liability company. Defendant operates a pawn shop in Tustin, California.

## GENERAL ALLEGATIONS

### I. Debtor's Operations

11.    Bernard Mayfield ("Mr. Mayfield") founded the Debtor on October 10, 2013. At all relevant times, Mr. Mayfield was the 100% equity interest holder in the Debtor. He served as its President and Chief Executive Officer until his death in April, 2021.

12.    In 2014, Mr. Mayfield asked his sister, Marilyn Adjangba ("Ms. Adjangba"), to work at the Debtor. Ms. Adjangba worked at the Debtor through 2021, becoming its Chief Operating Officer upon Mr. Mayfield's death. She did not have a title prior to April, 2021. Mr. Mayfield also asked Mr. Wright to and Michael Micheletti ("Mr. Micheletti") to work at the Debtor. Mr. Wright's title was General Manager. Mr. Micheletti held various

1    titles including Chief Operating Officer and Chief Technology Officer. Mr. Roger

2    Jefferson was the Debtor's Vice President of Operations.

3         13.    As part of the Debtor's efforts to solicit new investment, from time to time

4    Mr. Mayfield, Mr. Micheletti, and Mr. Wright participated in video interviews with third

5    parties such as Mountain West IRA. In those videos, Mr. Mayfield, Mr. Micheletti, and

6    Mr. Wright explained the Debtor's business and promoted investing in antenna towers. In

7    those videos, Mr. Wright referred to himself as Bob Davis. In others, he referred to

8    himself as Wally Wright. Mr. Wright also participated in video interviews on his own,

9    such as the video identified in paragraph 2.

10         14.    The Debtor's pitch to investors was this: for every $25,000 invested, the

11    Debtor would use that money to: (i) purchase a radio antenna on behalf of the investor,

12    which the investor would then own, (ii) install that antenna on property the Debtor had

13    previously leased from a third party, (iii) obtain a license from the FCC in the name of the

14    investor to use a certain radio frequency at that particular location, (iv) lease both the

15    antenna and the FCC license from the investor, for $500 per month, and (v) use that

16    antenna and license to provide Internet service to paying customers. The Debtor

17    guaranteed that any investor could leave the investment at any time, and receive a full

18    buyback of its initial investment.

19         15.    The Debtor's pitch attracted numerous investors. One investor, Kenneth

20    Thieman, began investing with the Debtor in 2014. Others invested in 2015 and 2016.

21    From February 1, 2017, through December 31, 2017, investors transferred $4 million to

22    the Debtor—160 towers. In 2018, investors transferred $3.2 million to the Debtor. In

23    2019, $4.6 million. In 2020, $3.9 million.

24         16.    The Debtor did obtain FCC licenses for some investors, which identified

25    latitude and longitude coordinates that allowed the investor to broadcast at a specific

26    bandwidth range at that location. The Debtor also leased roof spaces from third parties,

27    and acquired some antennas to place on those roofs. The Debtor also had some customers,

28    mostly small businesses, who paid the Debtor monthly for internet use. From February 1,

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

SFW 54135631v1

4

2017 through December 31, 2017, the Debtor's gross income from those customers was $140,000. In 2018, the Debtor grossed $190,000. In 2019, its gross income was $240,000. In 2020, $256,000. That income was not sufficient to pay operational expenses and make lease payments at $500 per month per tower. Considering solely the 160 towers purchased in 2017, the Debtor's monthly leaseback obligation was $80,000. The Debtor's gross monthly revenue from customers never exceeded $40,000, ever. The only way the Debtor could pay old investors was to obtain money from new investors.

17.    The Debtor was a Ponzi scheme. It obtained substantially all of its "revenue" from new investments, with only a small percentage coming from customers paying for internet service. The Debtor's 2018 tax return, which reported income of $3,091,834, was simply a total of all deposits made into the Debtor's primary investment account at First Bank, Account No. x0438 ("Account 0438"). This not only treated investor deposits as pure income, but failed to account for actual customer revenue deposited into the Debtor's other bank accounts: Chase Bank Account Nos. x6183, x2736, and x3932. In 2018, investor deposits totaled $3,205,000. Customer revenue totaled only $190,000.

18.    In 2018, customer revenue accounted for only 5.6% of all deposits being made into the Debtor's accounts. That percentage is lower for both 2017 and 2019. In 2020, it was 6.1%. A graphical representation of investments versus revenue is on the following page:

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264



19.     Mr. Mayfield, Ms. Adjangba, Mr. Micheletti, and Mr. Wright did not operate the Debtor as a legitimate business.  Nevertheless, the Debtor did have some expenses which it paid in order to appear legitimate.  It leased office space, which Mr. Mayfield used to pitch potential investors.  It had employees.  It purchased office supplies.  It made lease payments to investors.  But those payments were minor compared to the transfers the Debtor made to or for the benefit of insiders, including numerous family members of Mr. Mayfield.  The Trustee seeks to avoid all such transfers—including the Four-Year Transfers—that fall into that category, specifically transfers made to parties who either (i) provided the Debtor with no reasonably equivalent value in exchange, or (ii) did not take the transfers in good faith.

## II.  The Fraud

20.     Prior to founding the Debtor, Mr. Mayfield worked at company in Texas that licensed radio frequencies from the U.S. government to re-sell on the private market, for the purposes of redistributing cell phone uses across the radio spectrum.  Mr. Mayfield used his familiarity with that industry to defraud investors of the Debtor.

21.     Mr. Mayfield used an attorney, Mr. Holt Smith, to modify contracts that Mr. Mayfield had used in his former business, for use in the Debtor's fraudulent scheme.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL. 213.626.2311 • FAX 954.771.9264

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

These documents gave the veneer of legitimacy. The Debtor entered into "Telecommunications Lease Agreements" with each investor, which promised a certain rate of return in exchange for an investment. A "Spectrum Link Corporation Services And Purchase Agreement" stated that the Debtor would purchase an antenna, install it, and also submit an application to the FCC to obtain a license to use a certain millimeter wave frequency. Some investors received a GHz Registration form. A "12 Month Service Guarantee" promised a full refund to the investor, if the Debtor did not carry out its obligations. The Debtor also provided some investors with Sub-License Agreements between the Debtor and third parties, demonstrating that the Debtor had the right to place an antenna at a certain roof location.

22.    What the Debtor did not provide to investors was confirmation that an actual antenna existed, at a specific location, that corresponded with the latitude and longitude coordinates specified in the FCC license. The antennas that investors supposedly "purchased" either did not exist, or the Debtor oversold to multiple investors. Some investors became suspicious, and demanded their money be returned. For investors who purchased only one or two antennas, the Debtor might agree to repurchase the antennas. It could not always do so. Mr. Mayfield encouraged some protesting investors to sign a "Mutual Recission and Release Agreement" and a "Sell Permission Agreement," meant to further push back the deadline by which the Debtor had to return the investor's principal.

23.    Some investors commenced legal action, seeking to enforce the terms of the contracts. Typically, these were investors who had purchased so many towers that the Debtor could not have repurchased them if it wanted to. Kenneth Thieman filed a complaint in May, 2021, asserting that he invested $900,000 between 2014 and 2016: 36 towers, for a monthly lease obligation of $18,000. The highest gross monthly income the Debtor ever averaged in a calendar year--in 2020--was $21,314. The Debtor did not generate sufficient proceeds, at any point, to both operate and pay this single investor. The Debtor had more than 100 investors.

24.    In early 2018, the Debtor's fraudulent scheme nearly collapsed; new

investment suddenly dried up. Mr. Mayfield, promoting a new business venture called Spectrumlink Entertainment, Inc. and a music festival called "Lost in Paradise," obtained $972,500 in investor financing in April, 2018—more than the Debtor had ever received in a single month. Investments then plummeted—visible in the chart in paragraph 18. Over the next seven months, the Debtor averaged less than $100,000 per month in tower purchases. With gross monthly customer revenue averaging $16,500 at that time, the fraudulent scheme no longer made enough to pay old investors. In July, 2018, Mr. Mayfield wrote his investors a letter, stating that lease payments would cease, with no estimated restart date.

25.    For many of the Debtor's old investors, regular payments never did resume. Mr. Mayfield eventually began making payments to some, but at one-third the normal amount per tower:  $166.66 per month.  Mr. Mayfield and Mr. Wright—concealing the fact that the Debtor had ceased payments on old investments--successfully convinced new victims to invest.  The Debtor did not fold in 2018.

26.    In 2019, the Debtor obtained another $4.6 million in investments, with $1 million coming from a single investor.  The Debtor's 2019 revenue from customers was $240,000--a slight increase, but nowhere close to enough to make lease payments.  From February, 2017, through December, 2019, the Debtor received $11,780,597 in investor money:  471 towers.  The monthly expense on that debt was $235,000—the Debtor's approximate gross revenue for all of 2019.  The Debtor's monthly lease obligations could be paid only by new investment.  From January, 2020, until Mr. Mayfield's death in April 2021, an additional $5 million came in from investors.  After Mr. Mayfield's death, no further material investments came in.  The Debtor declared bankruptcy in August, 2018. At the time of its filing, the Debtor had $72 in its bank account.

27.    At all relevant times, Mr. Mayfield deposited investor money into Account 0438.  Customer revenue came into various accounts, but after May 1, 2018, exclusively into Chase Account 3932.  After May 1, 2018, the Debtor transferred cash as follows:  (i) Account 0438 to insider-related transferees, (ii) Account 0438 to Account 3932, (iii)

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

Account 3932 to employees, (iv) Account 3932 to investors, and (v) Account 3932 to miscellaneous third parties. The balance of Account 0438 fluctuated wildly, depending on the number of investor deposits. During a two-month period in 2018, it dropped by $1 million. The balance of Account 3932 remained steady. It received transfers from Account 0438 of just enough to cover expenses.

28.    Mr. Mayfield used Account 0438 to transfer large amounts of funds to insiders. During the Four-Year Period, he personally withdrew more than $900,000 in cash and cashier's checks, paid $300,000 as a deposit for a residence located at 712 S. Lost Canyon Road in Anaheim Hills, California (the "Anaheim Property"), and paid credit cards issued to him personally, totaling more than $1 million. He made significant transfers to family members, including the mothers of certain of his children: Iris Berdugo ($210,000 including rent payments), and Jasmine Archie ($380,000, including rent payments and car lease).

29.    Despite telling investors that there was not enough money to pay them their monthly lease payments, Mr. Mayfield signed a lease in July, 2020, for a brand new Ferrari, valued at more than $200,000, using $15,000 of the Debtor's money to fund the down payment, and committing the Debtor to make monthly lease payments of nearly $3,000. Those payments continued through September, 2021—after the Petition Date. Mr. Mayfield also used Debtor's money to pay the lease on a Rolls Royce Dawn through March 2021 (approximately $4,000 per month), and a 2014 Bentley for a certain Dr. Kain Kumar through February, 2021 ($3,000 per month)—despite Mr. Kumar being sentenced to a two-year prison term for Medicare fraud on January 6, 2020.

30.    Mr. Mayfield made his largest non-family payments to Mr. Micheletti and Mr. Wright. During the Four-Year Period, Mr. Micheletti received $402,500 through his company Micheletti Consulting. Mr. Wright received $1.3 million, through his companies Enumah Group ($595,000), AWB Consulting ($530,000), Global Distribution Group ($170,000), and his alter ego "Bob Davis" ($8,875). Mr. Jefferson received $220,000. Dr. Alex Mukathe, the Debtor's accountant, received $82,000.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

31.     The Debtor's fraud was unsustainable.  From February, 2017, through April, 2021, investors paid $16,850,000 to the Debtor---674 purported towers.  The monthly payment on that debt--$337,000—was more than the gross revenue Debtor had made in any year of its operation.  The fraudulent scheme finally collapsed in April, 2021.

32.     On April 1, Mr. Mayfield was admitted into Placentia Linda Hospital in Orange, California with complications from Covid-19.  His health did not improve.  On April 7, Mr. Mayfield signed over power of attorney to Ms. Adjangba.  On April 9, Mr. Mayfield signed his last check on behalf of the Debtor.  Ms. Adjangba forged Mr. Mayfield's signature on two more checks, to transfer funds from Account 0438 to Account 3932.  On April 19, 2021, Mr. Mayfield died.  The Debtor sent a letter out to investors the next day, informing them of his death.

33.     Ms. Adjangba became the Debtor's Chief Operating Officer, but the Debtor's business activity largely ceased:  from May, 2021, onward, the Debtor received only $37,350 from investors.  Ms. Adjangba transferred $20,000 to Mr. Wright on April 20, 2021, but largely ceased paying other expenses.  With no funds coming in except customer revenue—not enough to operate—bankruptcy loomed.

34.     Ms. Adjangba and Roger Jefferson met with bankruptcy counsel Michael Berger on June 4, 2021.  Ms. Adjangba met again with Gary Baddin, who worked with Michael Berger, on July 14, 2021.  In that meeting, Ms. Adjangba informed Mr. Baddin that Mr. Mayfield may have embezzled $3,676,000 from the Debtor.  This was true, of course, because Ms. Adjangba had personal knowledge that Mr. Mayfield used Debtor's funds to benefit her family members.

35.     The Los Angeles Sheriff seized the Debtor's bank accounts in July, 2021, taking $40,000 in cash.  The Debtor filed its bankruptcy case on August 11, 2021.  Ms. Adjangba signed the petition as the Debtor's Chief Operating Officer.  She has since ceased communicating with the Trustee.

**III.  The Trustee's Investigation**

36.     Upon his appointment, the Trustee investigated the Debtor and the transfers

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1  made by the Debtor during the Four-Year Period.  Specifically, the Trustee obtained and

2  reviewed all bank statements in the Four-Year Period in the name of the Debtor at First

3  Bank (Account 0438) and Chase Bank Accounts 2721, 6183, 2736, 3932, 3957, and 5023.

4  Of these last accounts, accounts 3957 and 5023 had no material activity.  Chase Account

5  6183, opened in January, 2016, was used as the Debtor's primary operating account until

6  May, 2018, then closed and Account 3932 became the primary operating account.

7      37.    The Trustee determined as part of this investigation that the Debtor made

8  transfers to four broad categories of transferees.  First, the Debtor made payments to

9  investors.  Second, the Debtor made payments to third parties for expenses necessary to

10  maintain the illusion that the Debtor was a legitimate business:  office leases, rooftop

11  leases, FedEx charges, utilities, certain employees.  Third, the Debtor made payments

12  directly to insiders who perpetrated the fraudulent scheme:  Mr. Mayfield, Mr. Wright, Mr.

13  Micheletti, Ms. Adjangba, Dr. Mukathe.  Fourth, the Debtor made payments to third

14  parties to pay expenses owed by other third parties, typically Mr. Mayfield's family

15  members and insiders:  apartment rent, car leases, school tuition, jewelry—the Four-Year

16  Transfers fall into this category.

17      38.    Next, the Trustee reviewed applicable defenses that apply in the context of

18  Ponzi scheme cases in the U.S. Court of Appeals for the Ninth Circuit (the "Ninth

19  Circuit").  Here, the Debtor's operations qualified as a Ponzi scheme as articulated by the

20  Ninth Circuit in In re Agricultural Research Technology Group, 916 F.2d 931 (9th Cir.

21  1990) because it was an arrangement whereby the Debtor made payments to investors

22  from the proceeds of a later investment rather than from profits of the underlying business

23  venture, as investors expected.  This gave investors the impression that a legitimate profit

24  making business opportunity existed, where in fact no such opportunity existed.  Once a

25  Ponzi scheme is found to exist, all transfers made in connection with that Ponzi are

26  deemed fraudulent, as all such transfers are made for the purpose of reinforcing the illusion

27  that the Ponzi is a legitimate investment vehicle and thus, encouraging additional

28  investment into the scheme.  AFI Holding, Inc. v. Mackenzie, 525 F.3d 700, 704 (9th Cir.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

2008).  However, transferees may possess a defense if they received the transfers in good faith and in exchange for value.  The Ninth Circuit in <u>Donell v. Kowell</u>, 533 F.3d 762 (9th Cir. 2008) stated that for defrauded investors there is  "netting" of the principal invested against amount received from the Ponzi--the balance is an avoidable transfer.

39.    For this reason, the Trustee evaluated, in the case of each transferee, whether that transferee gave value to the Debtor, whether the transferee gave value in good faith, and for each investor, whether that investor received more than they invested with the Debtor.  The Trustee mailed approximately 120 demand letters to transferees, including the Defendant and received numerous responses which the Trustee also analyzed, to determine whether an avoidance action should be brought.

40.    After performing this analysis, the Trustee determined that an avoidance action should be brought against the Defendant, to avoid and recover the Four-Year Transfers.

### IV.   The Transfers

41.    In the two-year period prior to the Petition Date, from August 11, 2019, to August 10, 2021 (the "<u>Two-Year Period</u>"), the Debtor made payments to Defendant by wire or by check written from Account 0438 in the total amount of $33,697.00  (the "<u>Two-Year Transfers</u>")

42.    The Two-Year Transfers are identified by amount of each individual payment, and the date the payment was made, as follows:

| | |
|---|---|
| September 10, 2019: | $23,844.00 |
| <u>March 12, 2021</u>: | <u>$9,853.00</u> |
| Total: | $33,697.00 |

43.    In the four-year period prior to the Petition Date, from August 11, 2017 to August 10, 2021 (the "<u>Four-Year Period</u>"), the Debtor made payments to Defendant wire or by check written from Account 0438 in the total amount of $52,839.00 (the "<u>Four-Year Transfers</u>").

44.    The Four-Year Transfers consist of the Two-Year Transfers, plus the

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

following additional transfers identified by month and amount of each individual payment made during that month:

> February 21, 2019:    $11,191.00

> March 26, 2021:        $7,951.00

45.    The Defendant operates a pawn shop.  The Trustee is informed and believes that Mr. Mayfield made the Four-Year Transfers to Defendant in order to pay off a loan that Defendant made to Mr. Mayfield in his personal capacity.  As such, when making the Four-Year Transfers, the Debtor paid a debt for which it was not responsible, and for which the Debtor did not receive any value.  Further, Defendant knew at the time that it received payment from the Debtor, that the Debtor was paying a debt it did not owe, to pay an obligation that provided no benefit to the Debtor's business, and thus Defendant did not receive the Four-Year Transfers in good faith.

## V.    Badges Of Fraud Related To The Four-Year Transfers

46.    Multiple badges of fraud are present with respect to the Four-Year Transfers, including the following:

- The Debtor was a Ponzi scheme during its entire existence, as substantially all money generated by the Debtor's operations came from new investments, instead of regular business operations.  The Debtor solicited investments from investors at a time when its revenue source from customers paying for internet usage was minimal, and not sufficient to pay general operating expenses.  Further, investor deposits only burdened the Debtor with significantly more debt that it could not repay.  This meant that the Debtor was required to enter into more and more fraudulent transactions in order to pay for prior obligations;

- The Debtor was insolvent during the Four-Year Period;

- The Debtor had incurred, and was continuing to incur, substantial debt at the time the Four-Year Transfers were made;

- The Four-Year Transfers were made while the Debtor was under threat of

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

potential lawsuits. Had the Debtor's investors discovered the fraud, the Debtor and its principals would have been subject to numerous lawsuits. Certain of the Debtor's investors did pressure the Debtor to make payments, including buying back the antennas, after discovering the fraud, and in some instances including Mr. Thieman actually filed suit;

- The Debtor removed and concealed assets. Mr. Mayfield transferred investor money from the Debtor's accounts to himself, his family members, and other insiders to fund a lavish lifestyle, including purchasing the Anaheim Property.

- The Debtor made the Four-Year Transfers for less than reasonably equivalent value;

- The Debtor made false statements, concealed facts, and operated under false pretenses. Among other things, the Debtor made misrepresentations concerning the following: (a) its financial condition; (b) its contractual relationships with property owners including, specifically, leases of property where an investor-purchased antenna was to be placed, (c) its ownership of physical items such as antennas, and (d) its revenue from customers.

- The Debtor's transactions with third parties such as the Defendant were questionable and not in ordinary course for a legitimate business. Telecommunications companies such as the Debtor purported to be do not pay the debts of individuals who obtain personal loans from pawn shops.

- The Debtor made the Four-Year Transfers under secrecy and did not inform investors that it was using company funds to pay the personal debts of Mr. Mayfield.

- The Debtor was aware of investor deposits with the company and was aware that it was incapable of paying those investors back.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

**FIRST CLAIM FOR RELIEF**

**(Avoidance and Recovery Of Four-Year Transfers As Intentionally Fraudulent Transfers Pursuant To 11 U.S.C. § 544(b) And 550(a) And Cal. Civil Code § 3439.04(a)(1)) and 3439.07)**

47.     The Trustee realleges and incorporated herein by reference each and every allegation contained in the paragraphs above as though set forth in full.

48.     The Four-Year Transfers were made with the actual intent to hinder, delay, and/or defraud Debtor's creditors in that, among other things,

a.     the Debtor was a Ponzi scheme, in which substantially all of the income generated by the Debtor's operations came from investors, and not from other business activity, and money generated from new investors was used to pay off old investors;

b.     prior to receiving the Four-Year Transfers, the Defendant did not transfer any property to the Debtor of material value;

c.     at no time did the Debtor enter into any agreement with Defendant to pay Defendant for any good or service provided by Defendant to Debtor;

d.     the value of any consideration transferred by Defendant to the Debtor was not reasonably equivalent to the value of the Four-Year Transfers;

e.     The Four-Year Transfers effectuated a transfer of a substantial amount of the Debtor's assets;

f.     The Debtor was insolvent at the time the Four-Year Transfers were made;

g.     The Four-Year Transfers occurred after the Debtor incurred substantial debt; and

h.     The Four-Year Transfers were made for the benefit of an insider.

49.     At all relevant times, the Four-Year Transfers were voidable under California Civil Code §§ 3439.04(a) and 3439.07 by one or more creditors who held and hold unsecured claims against the Debtor that were and are allowable against the Estate

1  under 11 U.S.C. § 502.  These creditors include those creditors who are listed in the

2  Debtor's schedules as holding undisputed claims or who have filed proofs of claim against

3  the Estate.

4      50.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 544(b)

5  and 550(a) that the Four-Year Transfers are avoided.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery Of Four-Year Transfers As Constructively Fraudulent Transfers Pursuant To 11 U.S.C. § 544(b) And 550(a) And Cal. Civil Code § 3439.04(a)(2)) and § 3439.05 and California Civil Code § 3439.07)

10     51.    The Trustee realleges and incorporated herein by reference each and every

11  allegation contained in paragraphs above as though set forth in full.

12     52.    At the time of the Four-Year Transfers, the Debtor:  (i) was engaged in a

13  business for which the remaining assets of the Debtor were unreasonably small in relation

14  to the business; (ii) intended to incur, or believed or reasonably should have believed that it

15  would incur, debts beyond its ability to pay as they became due; or (iii) the Debtor was

16  insolvent.

17     53.    The Debtor made the Four-Year Transfers to the Defendant without

18  receiving a reasonably equivalent value in exchange for the transfers.

19     54.    The Trustee is entitled to an order and judgment under 11 U.S.C. § 544(b)

20  and 550(a) that the Four-Year Transfers are avoided.

## THIRD CLAIM FOR RELIEF

### (Avoidance and Recovery Of Two-Year Transfers As Intentionally Fraudulent Transfers Pursuant To 11 U.S.C. §§ 548(a)(1)(A) and 550(a))

24     55.    The Trustee realleges and incorporated herein by reference each and every

25  allegation contained in the above paragraphs as though set forth in full.

26     56.    During the Two-Year Period, the Debtor made the Two-Year Transfers to or

27  for the benefit of the Defendant.

28     57.    The Two-Year Transfers were made by the Debtor with the actual intent to

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1   hinder, delay, or defraud the Debtor's creditors.

2       58.    The Defendant did not provide the Debtor with reasonably equivalent value

3   in exchange for the Two-Year Transfers and did not take such transfers in good faith.

4       59.    The Trustee is entitled to an order and judgment under 11 U.S.C. §§

5   548(a)(1)(A) and 550(a) that the Two-Year Transfers are avoided.

6       <u>**FOURTH CLAIM FOR RELIEF**</u>

7   **(Avoidance and Recovery Of Two-Year Transfers As Constructively Fraudulent**

8       **Transfers Pursuant To 11 U.S.C. §§ 548(a)(1)(B) and 550(a))**

9       60.    The Trustee realleges and incorporated herein by reference each and every

10   allegation contained in the above paragraphs as though set forth in full.

11       61.    At the time of the Two-Year Transfers, the Debtor:  (i) was insolvent, (ii)

12   was engaged in a business for which its remaining assets were unreasonably small in

13   relation to the business, or (iii) intended to incur, or believed or reasonably should have

14   believed that it would incur, debts beyond its ability to pay as they became due.

15       62.    The Debtor made the Two-Year Transfers to the Defendant without

16   receiving a reasonably equivalent value in exchange for the transfers.

17       63.    The Trustee is entitled to an order and judgment under 11 U.S.C. §§

18   548(a)(1)(B) and 550(a) that the Two-Year Transfers are avoided.

19       <u>**FIFTH CLAIM FOR RELIEF**</u>

20   **(Recovery Of Transfers Or The Value Thereof Pursuant To 11 U.S.C. § 550)**

21       64.    The Trustee realleges and incorporated herein by reference each and every

22   allegation contained in the above paragraphs as though set forth in full.

23       65.    To the extent that the Defendant is not the initial transferee of the Four Year

24   Transfers, the Defendant is the immediate or mediate transferee of the initial transferee of

25   such transfer.

26       66.    The Four-Year Transfers are recoverable from Defendant as the immediate

27   or mediate transferee of the Four-Year Transfers that the Debtor made with the actual

28   intent to hinder, delay, or defraud its creditors, including those creditors who are listed in

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1  the Debtor's schedules as holding undisputed claims or who have filed proofs of claim

2  against the Estate.

3      67.    To the extent the Four-Year Transfers are avoided, the Trustee may recover,

4  for the benefit of the Estate, the Four-Year Transfers, or, if the Court so orders, the value

5  of the Four-Year Transfers.

6      **FOR THESE REASONS**, the Trustee prays for judgment against Defendant

7  as follows:

8      **ON THE FIRST CLAIM FOR RELIEF**

9      1.    For a judgment that the Four-Year Transfers are avoided under §§ 544(b)

10  and 550(a) and/or providing any other remedy available under applicable law;

11      **ON THE SECOND CLAIM FOR RELIEF**

12      2.    For a judgment that the Four-Year Transfers are avoided under §§ 544(b)

13  and 550(a) and/or providing any other remedy available under applicable law;

14      **ON THE THIRD CLAIM FOR RELIEF**

15      3.    For a judgment that the Two-Year Transfers are avoided under §§

16  548(a)(1)(A) and 550(a) and/or providing any other remedy available under applicable

17  law;

18      **ON THE FOURTH CLAIM FOR RELIEF**

19      4.    For a judgment that the Two-Year Transfers are avoided under §§

20  548(a)(1)(B) and 550(a)  and/or providing any other remedy available under applicable

21  law;

22      **ON THE FIFTH CLAIM FOR RELIEF**

23      5.    To the extent any of the Four-Year Transfers are avoided, for a judgment that

24  the Trustee may recover, for the benefit of the Estate, such transfer, or, if the Court so

25  orders, the value of such transfer, under 11 U.S.C. § 550(a);

26      **ON ALL CLAIMS FOR RELIEF**

27      6.    For interest as permitted by law from the date of the Four-Year Transfers;

28  and

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

1        7.     For costs of suit incurred, including attorney's fees.

2 DATED:  June 9, 2023           **GREENSPOON MARDER LLP**

3

4

          By: _____

5               Steven F. Werth

6               Attorneys for Howard M. Ehrenberg, Chapter
              7 Trustee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 954.771.9264

SFW 54135631v1                        

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFF<br><br>HOWARD M. EHRENBERG, Chapter 7 Trustee | DEFENDANT<br><br>IDEAL LUXURY, LLC, a California limited liability company |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Mark S. Horoupian (CA Bar No. 175373)<br>*mark.horoupian@gmlaw.com*<br>Steven F. Werth (CA Bar No. 205434)<br>*steven.werth@gmlaw.com*<br>**GREENSPOON MARDER LLP**<br>1875 Century Park East, Suite 1900<br>Los Angeles, California 90067<br>Telephone: 213.626.2311 | **ATTORNEYS** (If Known) |

| PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☐ Other<br>☒ Trustee | PARTY (Check One Box Only)<br>☐ Debtor  ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor  ☒ Other<br>☐ Trustee |
|---|---|

CAUSE OF ACTION (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

**AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. §§ 544, 548, and 550**

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| FRBP 7001(1) – Recovery of Money/Property | FRBP 7001(6) – Dischargeability (continued) |
|---|---|
| ☐ 11-Recovery of money/property - §542 turnover of property | ☐ 61 -Dischargeability - §523(a)(5 ), domestic support |
| ☐ 12-Recovery of money/property - §547 preference | ☐ 68-Dischargeability - §523(a)(6), willful and malicious injury |
| ☐ 13-Recovery of money/property - §548 fraudulent transfer | ☐ 63-Dischargeability - §523(a)(8), student loan |
| ☐ 14-Recovery of money/property - other | ☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support) |
| **FRBP 7001 (2) – Validity, Priority or Extent of Lien** | ☐ 6 5 -Dischargeability - other |
| ☐ 21-Validity, priority or extent of lien or other interest in property | |
| | **FRBP 7001(7) – Injunctive Relief** |
| **FRBP 7001( 3) – Approval of Sale of Property** | ☐ 71 -Injunctive relief- imposition of stay |
| ☐ 31-Approval of sale of property of estate and of a co-owner – §363(h) | ☐ 72-Injunctive relief - other |
| | |
| **FRBP 7001(4 ) – Objection/ Revocation of Discharge** | **FRBP 7001(8) Subordination of Claim or Interest** |
| ☐ 41-Objection/re vocation of discharge - §727(c),(d),(e) | ☐ 81 -Subordination of claim or interest |
| | |
| **FRBP 7001(5) – Revocation of Confirmation** | **FRBP 7001(9) Declaratory Judgment** |
| ☐ 51-Revocation of confirmation | ☐ 91 -Declaratory judgment |
| | |
| **FRBP 7001(6) – Dischargeability** | **FRBP 7001(10) Deter mi nation of Removed Act ion** |
| ☐ 6 6 -Dischargeability - §523(a)(1),(14),(14A) priority tax claims | ☐ 01 -Determination of removed claim or cause |
| ☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud | **Other** |
| ☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny | ☐ SS-SIPA Case - 15 U.S.C. §§78aaa *et.seq.* |
| | ☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case) |
| **(continued next column)** | |

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | ☒ Demand: $52,839.00 |

Other Relief Sought
For interest and costs of suit.

SFW 54351303v1

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>SPECTRUM LINK, INC. | BANKRUPTCY CASE NO.<br>2:21-bk-16403-VZ | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central | DIVISION OFFICE<br>Los Angeles | NAME OF JUDGE<br>Hon. Vincent P. Zurzolo |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br><br>June 9, 2023 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Steven F. Werth | |

# INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.